James H. SALLIS, Plaintiff,

v.

UNIVERSITY OF MINNESOTA, Defendant.

No. Civ.02–1275(RHK/RLE).

United States District Court, D. Minnesota.

June 18, 2004.

Lateesa T. Ward, Damon L. Ward, and Cassandra Ward Brown, Ward & Ward, LLC, Minneapolis, Minnesota, for Plaintiff.

Brian J. Slovut, Office of General Counsel, University of Minnesota, Minneapolis, Minnesota, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiff James H. Sallis, an African American, has sued Defendant University of Minnesota ("the University") alleging that the University violated, *inter alia,* Title VII of the Human Rights Act of 1964 by discriminating against him while he worked as a utility worker in the University's parking and transportation department. At the close of discovery, the University moved for summary judgment on the ground that Sallis cannot demonstrate unlawful discrimination. Because the evidence shows, at most, personal rather than racial antipathy between Sallis and his University supervisors, the Court will grant the motion.

### Background

#### I. Introduction

In 1993, James Sallis began working for the University and continues to work there to this day. His first University job was as a delivery person in the University Stores. In December 1994, he transferred to the Parking and Transportation building, where he worked as a utility worker until August 2000. Since at least 1996, Sallis's supervisors have taken issue with his performance in a number of areas, including,

> excessive use of sick leave, lack of attention to detail in cleaning, taking unauthorized breaks, being late to work, not completing daily duty sheets, not listening to instructions from supervisors, refusing to perform work, leaving his as-

signed work area, failing to perform or to adequately perform assigned tasks, and, on at least one occasion, sleeping during his shift.

(Kistler Aff. ¶ 2.)

#### II. Sallis's Union Grievance

On August 1, 2000, Arthur Kistler, Manager of Maintenance, Parking & Transportation Services, told Sallis that he was going to be laid off. According to Kistler, "this lay-off is a result of the abolishment of the current Transportation and Safety Building custodial position arrangement and is not a reflection on the quality of your work." (Ward Aff. Ex. 24 at 786.) Two-and-a-half weeks later, however, Kistler rescinded the lay off notice. Because Sallis is a member of the Teamsters Union Local at the University, Kistler was required to lay off a worker with less seniority than Sallis. (Ward Aff. Ex. 24 at 788.) Following the elimination of his position, he was reassigned to the University's Fourth Street Parking Ramp. (*Id.* at 789.)

At the Fourth Street Ramp, Sallis was scheduled to work the third shift. (*Id.*) While his hours at the Parking and Transportation building ran from mid-afternoon until late-evening, the new shift was from 10:00 p.m. until 6:30 a.m. (*Id.*) On November 30, 2000, Teamsters Union Local 320 filed a grievance on Sallis's behalf alleging that the University had violated Sallis's seniority rights by assigning him to the third shift. (McGlynn Aff. ¶ 3.) The University followed the four-step grievance resolution procedure set forth in the collective bargaining agreement:

> Step 1 is a presentation of the grievance by the union to the employee's supervisor for potential resolution; Step 2 is a meeting with the department head or his/her designee regarding the grievance and then an answer to the grievance from that individual; Step 3 is presentation of the grievance to Human Re-

sources, with first a meeting held and then a decision issued; Step 4 is arbitration.

(*Id.* ¶ 2.) At Step 1, Kistler denied the grievance on the ground that Maintenance, Parking and Transportation decides shift changes "based on the amount of time spent by an employee in a particular area under a first-line supervisor." (Kistler Aff. ¶ 21.) At Step 2, the Assistant Director of Parking and Transportation Services found that Sallis was entitled to retain his department-wide seniority rights, but did not resolve the issue of the shift change. (*Id.* ¶ 5.) At Step 3, the Human Resources representative found that the collective bargaining agreement did not require management to use any particular kind of seniority system with regard to shift-changes, and that the practice of using site-specific seniority was a reasonable one. (*Id.* ¶ 7.) The union did not seek arbitration. Sallis remained on the third shift.

### III. Promotions Denied

Shortly after arriving at the Fourth Street Ramp, Sallis applied for a job as the third-shift General Maintenance Supervisor. Five applicants were interviewed by a panel consisting of Edward Tolan, the General Maintenance Supervisor for the Fourth Street Ramp, Joseph Dahip, the Parking Area Supervisor for the University, and Kistler. During the interview,

> Each applicant was asked the same questions in the interview in the following areas: (1) supervisory experience; (2) education and training; (3) maintenance and custodial experience; (4) familiarity with PC's, word processing, other programs; and (5) general interview questions. A weighted numerical score in each of these areas was given to each applicant by each committee member based on responses to the questions.

(Kistler Aff. ¶ 10.) Out of a possible score of 80, the three interviewers gave Sallis scores of 44, 51, and 56. (Tolan Aff. Ex. 3; Dahip Aff. ¶ 4; Kistler Aff. ¶ 11.) Another interviewee, James Trombley, received scores of 51, 60, 64. (Tolan Aff. Ex. 4; Dahip Aff. ¶ 5; Kistler Aff. ¶ 12.) Trombley was hired.

A month later, the University posted a job opening for a third-shift Maintenance and Operations Mechanic. (Kisler Aff. ¶ 14.) Sallis was one of two candidates to interview for the job. (*Id.* ¶ 16.) The hiring committee consisted of Tolan, Trombley, and Kistler. (*Id.*) Because the Maintenance and Operations Mechanic is a technical position, the interviewees were asked questions regarding the maintenance and repair of parking ramp equipment. These included questions such as "[d]escribe two specific parking meter diagnostic codes and the repair actions they prompt," "[w]hat is the function of an I-Red," and "[u]nder what circumstances must a fee computer be reset." (*Id.* Ex. J.) Sallis answered only two of the twelve questions correctly. (*Id.* ¶ 17.) The other interviewee, Brian Hisle, answered all twelve questions correctly. (*Id.* ¶ 18.) Hisle was offered the position. The committee noted that Hisle had 133 to 140 hours of training time and 720 hours of field experience, while Sallis had only 19 hours of training time and no hours of field experience. (*Id.* Ex. L at 4373.) Moreover, Kistler found Sallis's answers to be "ad lib and evasive." (*Id.* Ex. J. at 4382.) When Sallis challenged the questions during the interview, Kistler responded that they had been approved by human resources. Sallis responded, "You own H.R." (*Id.*)

### IV. Racial Comments

While he worked at the Fourth Street Ramp, University employees made several comments that Sallis considered to be racial. Most significantly, Sallis states that Trombley, who had become his direct supervisor, called him "tan" in front of Kistler:

Well, we was talking about tan, there was somebody with Trombley, and I just got off work, and it was early in the morning, which I get off at 6:00; and so I went in the place and the manager was standing over the table with Trombley, and I handed him my log sheet, and he said how's it going, and Trombley said, well, we get along pretty well, me and Jim, with a t-t-t-tan, with a tan. . . . I can't believe he said that. . . . He said that Jim Sallis and I get along fine with a tan, t-t-tan, so. I assume he was saying this black guy with a tan.

(Ward Aff. Ex. 4 at 4–5.) Sallis also states that Trombley was making a racial reference when he called him "a particular person."

I've heard him say Jim Sallis is a particular person, we have to watch what we do, and the new guy . . . . that we have working there, he came to me and said, yeah, Jim, you're a very particular person. I'm saying, what are you saying. Well, that's what Jim Trombley told me.

(*Id.* at 8.) In addition to these comments, Sallis asserts a parking attendant "was talking about niggers," and that an ex-utility worker would "come in all the time and talk about all of the damn Somalians." (*Id.* at 14, 15.)

## V. Disciplinary Action

During his time at the Fourth Street Ramp, Sallis was regularly disciplined in connection with his performance. For instance, on April 13, 2001, Trombley sent Sallis a "formal warning" in connection with several incidents:

On March 8, 2001 you had received a verbal warning in part due to failing to follow orders. On several prior occasions during your employment with Parking and Transportation Services, you have received coaching and clarification of expectations related to poor work performance and resisting direct orders.

On April 4, you were assigned the task of sweeping the southwest stairwell in the Fourth Street Ramp (FSR). On your duty log you indicated that this assignment was completed. Upon inspection, numerous accumulations of dirt and sand made it apparent that the work was not done. You then stated that you'd swept the entire seven story stairwell with a 6–inch "toy" broom.

On April 5, this time with instructions to use a more appropriate broom, you were assigned to sweep the FSR stairwells. Near the end of your shift on the morning of April 6th, you asked another worker to look at the southwest stairwell to confirm that it had been done. That worker stated that the stairwell was still so dirty that he'd have been " . . . ashamed to admit . . ." having swept it. The follow-up inspection confirmed that the assigned job was again either not done or had been done very poorly.

On April 11, you were again assigned the sweeping of the three FSR stairwells, along with cleaning the hand and support railings, and the lobby and stair landing windowsills. You were given no other work [so you] should have been able to finish these assigned tasks well within your eight-hour shift. Later that same shift you reported that the work was done, but upon inspection the railing still had apparent accumulations of dust and the windowsills remained untouched. I then gave you rags, spray cleaner—and instructions to clean them again.

(Kistler Aff. Ex. B at 599.) Sallis also received several informal reprimands. These included an oral warning on June 17, 2002 for "refusing to perform the work that was assigned to him" (*id.* at 644), an oral reprimand on February 5, 2002 for "sleeping on the job" (*id.* at 638), and another oral warning on December 12, 2002 for refusing to watch a training video and calling Trombley a "liar" (*id.* at 655).

## VI. Minnesota Human Rights Complaint

On November 29, 2000, Sallis filed a charge of discrimination with the Minnesota Department of Human Rights. In it, he alleged that the University's disciplinary actions, failure to offer him a promotion, and various other acts constituted "discriminat[ion] against me in the area of employment on [account] of race and in the area of reprisal." (Slovut Aff. Ex. E at 536.) The Department investigated the charge, and on December 28, 2001 found that "there [was] No Probable Cause to believe that [the University had] engaged in an unfair discriminatory practice." (Second Slovut Aff. Ex. A.) The charge was dismissed. (Id.) On March 12, 2002, the Equal Employment Opportunity Commission adopted the Department's findings as its own. (Id. Ex. F.)

### Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322, 106 S.Ct. 2548; Mems v. City of St. Paul. Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir.2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir.2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir.1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256, 106 S.Ct. 2505; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir.1995); Elayaperumal v. Medtronic, Inc., Civ. No. 02–860 (RHK/SRN), 2003 WL 21402602, at *6 (D. Minn. June 17, 2003).

### Analysis

■ Sallis alleges that the University violated Title VII by discriminating against him on the basis of race.[1] Under Title VII, it is unlawful for an employer (1) to fail or refuse to hire or discharge any individual, or otherwise discriminate

---

1. Sallis also alleges that the same conduct violated 42 U.S.C. § 1981 and the Age Discrimination in Employment Act (ADEA). Although these claims would generally be analyzed with the Title VII claim, there are, in this instance, independent grounds which preclude consideration. Because the University is an instrumentality of the State, see Treleven v. University of Minnesota, 73 F.3d 816, 818–19 (8th Cir.1996), the § 1981 claim is barred by the Eleventh Amendment, see Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 618–19 (8th Cir.1995). While Sallis presumably could have sought damages from state officials in their personal capacities, see id., he has not done so here. The § 1981 claim must therefore be dismissed. Moreover, because Sallis has not exhausted administrative remedies in connection with age discrimination, his ADEA claim is not properly before the Court. "[A] prerequisite to filing suit under the ADEA is the filing of charges with the EEOC...." Philipp v. ANR Freight Sys., Inc., 61 F.3d 669, 676 (8th Cir.1995). Although Sallis asserts that his age discrimination claim is proper because it is the natural outgrowth of his race discrimination claim, the Court disagrees. Age and race are distinct protected categories and the exhaustion of remedies with regard to one does not create a right to sue for the other. See Clark v. Principi, 200 F.Supp.2d 1109, 1123 n. 23 (E.D.Mo.2002). Sallis's ADEA claim must therefore also be dismissed. Even were these grounds absent, the § 1981 and ADEA claims

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

A claim under Title VII may proceed on the basis of either direct or indirect evidence. Where, as here, the evidence of discrimination is indirect, the Court applies a modified version *McDonnell Douglas* framework applicable after *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).[2] Under this paradigm, the plaintiff must first present a prima facie case of discrimination. Where he does, "the employer must rebut the presumption of discrimination that his pri-

ma facie case raises by articulating a legitimate, nondiscriminatory reason for the adverse employment action." *Burkett v. Glickman*, 327 F.3d 658, 661 (8th Cir. 2003). If the employer makes that showing, the plaintiff must prove, by a preponderance of the evidence, that either (1) the defendant's reason is a pretext for discrimination, or (2) the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" was the plaintiff's protected characteristic. *Peterson*, 2004 WL 1179368, at *9. Pretext and mixed-motive may be shown with direct or circumstantial evidence. *Id.*

Sallis advances a variety of Title VII theories, including failure to promote, disparate treatment, hostile work environment, and retaliation. The Court will address each in turn.

## A. Failure–to–Promote

Sallis contends that the University violated Title VII by failing to offer him the General Maintenance Supervisor or Maintenance and Operations Mechanic positions.[3] To establish a prima facie failure-

---

would be subject to the same analysis as Title VII and the Court would reach the same result.

**2.** Like other federal courts, the District of Minnesota has grappled with the extent to which *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), alters the traditional *McDonnell Douglas* burden-shifting framework. The results are not uniform. *Compare, e.g., Dare v. Wal–Mart Stores, Inc.*, 267 F.Supp.2d 987, 990–93 (D.Minn.2003) (Magnuson, J.), *with Walker v. Northwest Airlines, Inc.*, Civ. No. 00–2604 (MJD/JGL), 2004 WL 114977, at *5 (D.Minn. Jan. 14, 2004) (Davis, J.). The undersigned recently dealt with this matter in some detail, *see Peterson v. Scott County*, 2004 WL 1179368, *6–11 (D.Minn. May 27, 2004) (Kyle, J.), and will not repeat that analysis here. Let it suffice to say that, in this instance, the Court would reach the same conclusion under any conceivable reading of *Desert Palace*.

**3.** Sallis also suggests that he should have been promoted to two other positions: athletic equipment worker and third-shift lead worker. The denial of the athletic worker position, however, occurred in 1997—long before post-February 19, 2000 time period relevant to this action. *See* 42 U.S.C. § 2000e–5(e)(1). Moreover, the lead worker position is not a recognized position within the University, but rather "a generic term for a member of the crew who was going to dispatch the paperwork and stuff like if a supervisor was taking vacation time or out sick." (Ward Aff. Ex. 5 at 26.) To the extent working as lead worker constitutes a promotion—and, to the Court's way of thinking, it does not—Sallis has not shown that he was qualified for the position or that the individual promoted in his stead possessed similar qualifications. Even if he could establish a prima facie case, the defects articulated below with respect to the final stage of the *McDonnell Douglas* analysis apply with even greater force to the lead worker position.

to-promote case, Sallis must prove that (1) he is a member of a protected class, (2) he was qualified and applied for a position for which the University was seeking applicants, (3) the University rejected him despite his qualifications, and (4) the University promoted a person with similar qualifications, but who is not a member of the protected class. *Marzec v. Marsh,* 990 F.2d 393, 395–96 (8th Cir.1993); *see also Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 258–59 (8th Cir.1996).

The University argues that cannot establish a prima facie case because Sallis has not demonstrated that he was qualified for either position. Even were Sallis qualified, the University contends, it has articulated a legitimate reason for its promotion decisions because it chose, in each instance, the more qualified applicant for the job. Finally, the University argues that Sallis's claim fails because he cannot demonstrate either that the University's stated reason is pretext or that Sallis's race was a factor in its decisions.

■ Assuming that Sallis can prove his prima facie case, the University has established a legitimate, nondiscriminatory reason for the promotion decisions it made. In general, the burden for doing so is "not onerous," and can be satisfied by showing that plaintiff, even if qualified, was a poor fit, or another candidate was a better fit for the job. *See Floyd v. Missouri Dept. of Social Servs.,* 188 F.3d 932, 936 (8th Cir.1999) (plaintiff lacked management ability); *Enowmbitang v. Seagate Tech.,* 148 F.3d 970, 973 (8th Cir.1998) (other candidates had higher college grade point averages); *Kobrin v. Univ. of Minnesota,* 121 F.3d 408, 411 (8th Cir.1997) (other candidates more qualified). Here, the contemporaneous records of the hiring committee show that, at least in the committee's eyes, Trombley and Hisle were the more qualified candidates. Each had more experience at the Fourth Street Ramp and

each fared better in the interview process. The University's rationale, taken as true, is legitimate and nondiscriminatory.

Thus, "the sole remaining issue [is] discrimination vel non." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Because the University has advanced a legitimate reason for its decision, Sallis must demonstrate—at the very least—a dispute of material fact over whether either the University's reason was pretextual or its decision tainted by considerations of race. He has not done so. While Sallis argues that the University's explanation defies belief because he had the most department-wide seniority, the hiring committee could legitimately prefer site-specific experience without running afoul of anti-discrimination laws. Sallis's experience in the Parking and Transportation building, while no doubt relevant, was only one of a number of factors the hiring committee considered. There is nothing to suggest that race was among the factors. Because the University, rather than the Court, is "in the best position to determine the most qualified applicant for a given position," *Ottman v. City of Independence,* 341 F.3d 751, 757 (2003), and because the Court does not "sit as a super-personnel department, second-guessing employment decisions," *id.* at 757–58 (citation and quotation omitted), Sallis has not carried his burden as to his failure-to-promote claim.

## B. Disparate Treatment

Sallis also asserts that the University treated him differently with regard to the terms and conditions of his employment. To present a prima facie case of disparate treatment, the plaintiff must establish that (1) he is a member of a protected class, (2) he was qualified for his position and performed his duties adequately, and (3) he suffered an adverse employment action un-

der circumstances that would permit the court to infer that unlawful discrimination had been at work. *Habib v. NationsBank,* 279 F.3d 563, 566 (8th Cir.2001). The University contends that Sallis cannot make out this prima facie case.

To support his claim of disparate treatment, Sallis advances a wide-range of workplace complaints. These include instances in which he was

- threatened with discipline when he fell asleep on his shift;
- chastised for arriving to work late;
- discussed in a demeaning and snide way in various e-mails;
- required to clean a parking ramp without a truck;
- accused of not cleaning vomit when in fact it was rust;
- written-up for fixing a gate arm that was not in his assigned work area;
- investigated for sexual harassment;
- accused of tampering with computers;
- given a lay-off notice that was subsequently revoked;
- required to do work that no one else did when he was on vacation;
- inquired about behind his back by his supervisors;
- required to re-do work.

In each instance, Sallis contends—without evidence aside from his own blanket statements—that white utility workers were not treated in the same fashion.

■ Sallis has not established his prima facie case. While he has put forth a laundry list of workplace complaints, "[n]ot every action that makes an employee unhappy is an adverse employment action." *Elayaperumal v. Medtronic, Inc.,* Civ. No. 02–860 (RHK/SRN), 2003 WL 21402602, at *8 (D. Minn. June 17, 2003) (Kyle, J.). An adverse employment action exists where there is "a *material* employment disadvantage, such as a change in salary, benefits,

or responsibilities." *Bradley v. Widnall,* 232 F.3d 626, 632 (8th Cir.2000). Thus, to constitute an "adverse employment action" the employer's conduct must have been "more disruptive than a mere inconvenience or an alteration of job responsibilities or changes in duties or working conditions that cause no materially significant disadvantage." *Nash Finch Co.,* 123 F.3d at 1060 (quoting *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994) (holding no adverse employment action where plaintiff was reassigned without diminution in title, salary or benefits)). Although Sallis was disciplined from time to time in connection with his performance, that is only relevant to the extent it is used "as a basis to detrimentally alter the terms or conditions of the recipient's employment." *LaCroix v. Sears, Roebuck, and Co.,* 240 F.3d 688, 692 (8th Cir.2001). Sallis has provided no evidence that the discipline here was so used.

■ Even were it to constitute an adverse employment action, it does not, in this instance, give rise to an inference of discriminatory intent. While Sallis has made vague and conclusory allegations that the University treated similarly-situated white employees differently with regard to the terms and conditions of employment, he has not provided any evidence to that effect. *Cf. Wiles v. Capitol Indem., Corp.,* 280 F.3d 868, 870 (8th Cir.2002) (courts are "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions"). Indeed, aside from a single, ambiguous use of the word "tan," the record is entirely bereft of anything relating to Sallis's race. Without evidence of a racial motive, the Court can only conclude that the well-documented antipathy between Sallis and his supervisors was of a personal, rather than racial nature. And

personal animus, even against a member of a protected class, "does not discrimination make." *Hanger v. Lake County,* Civ. No. 01–1506 RHK/RLE, 2002 WL 31912438, *7 (D.Minn. Dec. 31, 2002) (Kyle, J.). Because Sallis has failed to show either an adverse employment action or generate an inference of discrimination, he has not established a prima facie case on the terms and conditions of his employment.

## C.  Hostile Work Environment

■ Sallis also alleges that he was subjected to a hostile work environment. To establish a prima facie case, Sallis must demonstrate that: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper action. *Erenberg v. Methodist Hosp.,* 357 F.3d 787, 792 (8th Cir.2004); *Tademe v. Saint Cloud State Univ.,* 328 F.3d 982, 991 (8th Cir.2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *El-mahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 652 (8th Cir.2003). The objectionable environment must be both objectively severe, as it would be viewed by a reasonable person, and subjectively severe, as it was actually viewed by the victim. *See, e.g., Jackson v. Flint Ink North American Corp.,* 370 F.3d 791, 795 (8th Cir.2004).

■ Sallis has not shown harassment sufficiently severe or pervasive to have affected a term, condition, or privilege of his employment. Although Trombley arguably once called him "tan," and several utility workers made comments regarding race or national origin that did not refer to

him, these comments were "neither severe nor pervasive enough to create a hostile work environment." *Woodland v. Joseph T. Ryerson & Son. Inc.,* 302 F.3d 839, 844 (8th Cir.2002). "Because the discrimination laws are not a general civility code, offhand comments (unless extremely serious) and isolated incidents ... will not amount to discriminatory changes in the terms and conditions of employment." *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir.1998) (citation and internal quotations omitted); *see also Jackson,* 370 F.3d at 794. While such racial comments are, of course, inappropriate, offensive conduct is not enough to sustain a hostile work environment claim absent an effect on the terms or conditions of employment. *Woodland,* 302 F.3d at 843. Because "Title VII does not ... create a cause of action for all unpleasant or abusive behavior in the workplace," *Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir. 1997) (citation omitted), this claim also fails.

## D.  Retaliation

■ Finally, Sallis asserts that the University mistreated him because he complained about discrimination. To state a prima facie case of retaliation, Sallis must show that (1) he engaged in statutorily protected conduct, (2) there was an adverse employment action, and (3) a causal connection exists between his conduct and the adverse action. *See E.E.O.C. v. Kohler Co.,* 335 F.3d 766, 772 (8th Cir.2003). In support of this claim, Sallis puts forth the same evidence advanced in support of his other Title VII theories. While the charge filed with the Minnesota Department of Human Rights no doubt qualifies as statutorily protected conduct, Sallis has not, for the reasons stated above, made a showing of either an adverse employment action or a causal link between his discrimination complaints the University's conduct.

Without evidentiary support for these elements, he cannot establish a prima facie case. Accordingly, this claim, like Sallis's other Title VII claims, is defective. Summary judgment is therefore appropriate.

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 48) is **GRANTED.** Plaintiff's First Amended Complaint (Doc. No. 23) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**